By the Court.—Curtis, J.
The defendant testifies that he was the master of the vessel, and that his interest in her was to navigate her safely, and look after the safety of the passengers. The law imposes these duties upon him, and the duties of the stewards are, as his subordinates, to care for the comfort, nourishment, and welfare of the passengers. It is their immediate office to attend to the wholesomeness and ■cleanliness of the quarters, and of the food and of the «dishes in which it is served to the passengers. It is objected that the nature of the steward’s duties is not in proof, but it sufficiently appears in the case, that it was precisely these duties which were entrusted to the steward, and which he undertook to perform.
The health officer testifies to the -care that was taken in conducting the fumigation. He says “this involved that the steward should clear the passengers from the steerage, and keep them from this dangerous ■substance.” “ The utensils in which to pour the poison were furnished by the steward. ’’ Again, he says, “Irecollect having a conversation with the steward, Caesar, on that occasion, and on this matter; I have heard of accidents before from this poison having been drank by children on steamships ; it was since this one on the National Line. There was also a case occurred in the city, I think. I have heard of cases a number of times occurring from this fumigation.”
It was the obvious duty of the steward conversant as he was with the dangers attending this fumigation, *356 to have seen that the vessels supplied by him, and used in it, were removed from the cabin before he ordered the passengers to return there, especially as many of the passengers were of very tender years. The exclamation he made, and what he did, when the mother called his attention to the child just after it drank from the pannikin, revealed a knowledge of the danger and a consciousness that his not having removed it before, contributed to it. It appears that neglect on his part was fully established by the evidence.
The defendant insists, that in any event the child and its mother were guilty of contributory negligence. To determine that, it is necessary to refer to the testimony. The mother, who alone of those who were present at the occurrence was examined as a witness, testifies: “When I first went down, the steward came and served us with soup for our dinner; I was then sitting at the table, and my little boy sat down and took some soup with me, and then I sat down by the table in the steerage, and nursed the baby.” ‘ ‘ My little boy was playing at the back of me with some more children.” “He was playing there a good while, and was laughing quite hearty; I was nursing the baby, and did not notice the little boy for a good while. I would not let him away from my sight; he did not run up and down the steerage except while I was sitting there.” “ He would run around the table; sometimes my back would be towards him. I had been down stairs about half an hour, when my little boy came running to me; he did not come from one of the berths, he was standing behind me, playing.” “ The panniken was on a seat by the dining-table in the steerage, where he was playing. I was sitting at the corner, and he was playing behind me, and the pannikin was on the other side. When I looked around, that is where he was standing, taking the pannikin down from his mouth. He cried, and I looked around, *357 and he was just taking the pannikin down from, his mouth.”
So far from there being any negligence on the part of the mother, she seems to have devoted herself wholly to the care of her children. This child, nearly five years of age, was in her company at the time, playing, as was natural and proper just about her, in the cabin, where the mother had reason to consider everything safe, and the place in the vessel where the child was the least exposed to danger.
The mother was ignorant of the contents of the pannikin ; it was an ordinary tin drinking cup, and if she had seen the child take it to drink from it, as was perfectly natural and proper for the child, there is no reason to think she would have prevented the child from doing so. No contributory negligence is shown on the part of the mother, and for aught that appears in the case, the most cautious adult might have been poisoned as the child was, by this act of cruel negligence on the part of the steward. The carrier who undertakes to transport passengers of tender years, owes a duty to them, in view of their inexperience and infancy, to protect them the more carefully from danger. There was no contributory negligence shown on the part of the child.
A question is raised as to whether the master of a ship is personally liable for damages to third persons, by reason of the negligence of himself or those under him on board the ship. The master testifies that he did not employ the steward, but that he was employed, by the owners in Liverpool. From the very nature of' his position and responsibility as master of the ship,, and as this very designation of his position implies, all persons employed on board, whether by the owners or by him, are his subordinates. For wise reasons of public policy, the master is responsible as well as the owners for every injury that might have been pre. *358 vented by human foresight and care. When the owners are unknown, or reside in a foreign country, the injured party is not obliged to search for them, but he has his remedy against the master personally, who is responsible for his own negligence, and also for that of every one of his subordinates. In consequence of this . very responsibility, the law clothes the master with power to require and compfel strict obedience to his orders.
It is no answer for him to show that his subordinates are employed by the owners and not by him. He knows the responsibility of his position, and if he is not content to acquiesce in the employment of those under him by the owners, and to incur responsibility for their negligence, then he should not accept the post, or should retire from it. His position differs from that of the captain of a public armed vessel, who has no choice as to where he shall serve, but obeys the orders of his superiors, and is obliged to take the command, though he has no voice in the appointment of any one under him, and has, perhaps, grave reasons to distrust them. (Denison v. Seymour 9 Wend. 15 and 16 ; Schiefflin v. Harvey 6 Johns. 177; Watkinson v. Laughlen, 8 Id. 167; Foot v. Wiswall, 14 Id. 307.)
The defendant’s objections that the voyage was ended, and also that he had no authority on board of the ship at the time, as she was in the charge of the health officer, seem to be met by the testimony of the health officer. The latter testified that as soon as the mixturéis made below, the gas is generated, and that he and his men come up and leave, as they have nothing else to do, and no further authority, and that usually when there is no disease on board, the anchor is frequently up by this time, and the ship is left to proceed towards Hew York at once, while the fumigation is going on.
The voyage can not be considered as terminated until the vessel is moored at her point of destination, *359 and this brief visit from the health officers of the port, and delay, does not divest the master of his general authority and control over the vessel, and which he is bound to exercise for the purpose of facilitating this very act. The fumigation of the vessel, and the removing of the sick person to the quarantine hospital, deprived him of no authority to compel the steward, who furnishes the utensils to the health officers to pour the mixture into, to take proper care of them, after he had left, and especially when the passengers were required to descend to the cabin in which they had been used. It might as well be claimed that the boarding and presence of custom house-officers to prevent smuggling, or the enforcement of any police law or regulation, deprived the master of his authority and responsibility.
The absence of proof of special pecuniary damage to the next of kin from the death of the child, would not have justified the court in dismissing the complaint. (Ihl v. The Forty-second St. R. R. Co., 47 N. Y. 32).
It is contended that the plaintiff can not maintain this action in his representative capacity, as the surrogate of the county of New York had no power to issue the letters of administration.
The act under which this action is brought, Chap. 450, Session Laws q/1847, provides that whenever the death of a person shall be caused by the wrongful act, neglect, or default of another, for which the person injured could have maintained an action for damages if death had not ensued, then such action maybe brought by and in the name of the personal representative of the deceased.
Consequently, this action can only be brought in the name of a representative appointed by a court having jurisdiction.
The surrogate of the county of New York has- *360 jurisdiction by statute (2 R. S. 73,) to issue letters of administration, among other cases, in the following: “Where an intestate, at or immediately previous to his death, was an inhabitant of the county of such surrogate, in whatever place such death may have happened.” “Where an intestate, not being an inhabitant of this state, shall die in the county of such surrogate, leaving assets therein.”
Residence and domicil generally mean the same thing. An inhabitant is defined to be one who has his domical in a place (Crawford v. Wilson, 4 Barb. 520). The term “ inhabitant” as used in the Revised Statutes is to be construed in harmony with the law of domicil (Isham v. Gibbons, 1 Brad. R. 93). Was the intestate an inhabitant of the county of ISTew York at the time of his decease ?
The domicil of an infant follows that of its father. If the father dies, it follows, in the absence of fraud, that of its mother, until such time as the mother re-marries, when by reason of her own domicil becoming subordinate to that of her husband, that of the infant ceases to follow any further change by the mother, or, in other words, it does not follow that of its stepfather (Brown v. Lynch, 2 Brad. R. 2Í8 ; 2 Kent Com. 228 and 431; Potinger v. Wightman, 3 Merivdles R. 67 ; Somerville v. Somerville, 5 Vesey, 759 ; Inhabitants of Comnor v. Nulton, 2 Salkeld, 528 ; Andrews v. Herrot, note 2, 4 Cow. 516. Story Conflict of Laws, § 46).
This rule as to the infant’s domicil, derived from the civil law, seems for a long period to have been recognized in the common-law courts. It was held, ail the judges concurring, that where a father gains a second settlement after the birth of his child, that settlement is immediately communicated to the child, and children must be sent to their father’s settlement though never there before (Reading v. Eversley, 2 Session Cases, 116, temp. Geo. 1).
*361 The domicil of the intestate was that of the father. He came to Hew York as an emigrant, seven months before the death of the child. His wife and children left his former domicil, and came here to join him. From the time of his arrival, July 27, 1870, he has resided in this city continously up to the time of the trial, June 15th, 1875. His answer that he came here for the purpose of living here, and making it his home, was struck out by the court at the trial.
But the case discloses that he had established a domicil in New York. In Heidenbach v. Schland (10 How. Pr. R. 477), it was held, that a person, an emigrant, having left for ever his native land, and living in this state without any determination to reside else■where, is a resident here. In Lord Thurlow’s definition, in note (Marsh v. Hutchinson, 2 Bosanquet & Puller, 230), he uses this language: “A person’s being at a place is prima faoie evidence that he is domiciled at that place, and it lies on those who say otherwise to rebut that evidence.” “It may be rebutted no doubt;” and then he states what maybe shown in rebuttal, as his being in the place for health, business, or travelling, or by military orders, or in a diplomatic capacity.
In- the present case there is nothing proved in rebuttal of the plaintiffs testimony as to his residence here.
The intestate must have had a domicil, and he •could have but one domicil, and being an infant, the law made his domicil that of the father, which was in the county where the letters of administration issued (Crawford v. Wilson, 4 Barb. 519).
Even if the jurisdiction of the surrogate can be thus collaterally impeached, as the defendant claims, it can only be upon evidence plainly disproving the recitals in the letters of administration, and it is not to be arrived at by inferences or forced interpretations. *362 In Shelden v. Wright (5 N. Y. 497), it was held, that where certain facts were requisite to give the surrogate jurisdiction, and it appeared from the record that there was evidence tending to prove such facts, and that such evidence was adj udged to be sufficient, then that such judgment could not be collaterally impeached or contradicted.,
The injury and death of the intestate is not claimed by the plaintiff to have occurred within the limits of the county of ¡New York, though the statement of the mother that it was ip sight of Castle Garden,, and near the shore, is incongruous with her statement that it was in the quarantine. It may have occurred within the southern limits of the city, as established by the ancient grants from the crown, and which, confirmed by subsequent constitutional guarantees, are not affected by legislative enactments. If it occurred south of these limits, upon waters in the counties of Kings or ¡Richmond, then it occurred where the county of ¡New York possesses, for some1 purposes, a concurrent jurisdiction with those counties (Laws 1824, p. 359, § 2). But if the views heretofore expressed are correct, a consideration of any other questions for the disposition of the case becomes-unnecessary.
The case upon the evidence might properly have gone to the jury.
The judgment should be reversed, and a new trial ordered, with costs to abide events.
Sedgwick, J., concurred.